# United States Court of Appeals
# for the Fifth Circuit

_____

No. 23-50312

_____

United States Court of Appeals
Fifth Circuit

**FILED**

August 28, 2024

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellant*,

*versus*

Paola Connelly,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:22-CR-229-2

_____

Before Smith, Engelhardt, and Ramirez, *Circuit Judges*.

Kurt D. Engelhardt, *Circuit Judge*:

Paola Connelly is a non-violent, marijuana smoking gunowner. El Paso police came to her house in response to a "shots fired" call. When they arrived, they saw John, Paola's husband, standing at their neighbor's door firing a shotgun. After arresting him, they spoke with Paola, who indicated that she would at times smoke marijuana as a sleep aid and for anxiety. A sweep revealed that the Connellys' home contained drug paraphernalia and several firearms, including firearms owned by Paola. There was no indication that Paola was intoxicated at the time.

No. 23-50312

Paola was charged with violating: (1) 18 U.S.C. § 922(g)(3) by possessing firearms and ammunition as an unlawful user of a controlled substance, and (2) 18 U.S.C. § 922(d)(3) by providing firearms and ammunition to an unlawful user of a controlled substance. Paola argued in a motion to dismiss, and the District Court ultimately agreed, that §§ 922(g)(3) and 922(d)(3) were facially unconstitutional and that § 922(g)(3) was unconstitutional as applied to her under the Second Amendment.

This appeal asks us to consider whether Paola's Second Amendment rights were infringed, and the answer depends on whether § 922(g)(3) is consistent with our history and tradition of firearms regulation. The short of it is that our history and tradition may support some limits on a *presently* intoxicated person's right to carry a weapon (and for that reason Paola's facial challenges to §§ 922(g)(3) and 922(d)(3) fail), but they do not support disarming a sober person based solely on past substance usage. Nor, contrary to what the government contends, do restrictions on the mentally ill or more generalized traditions of disarming "dangerous" persons apply to nonviolent, occasional drug users when of sound mind. We AFFIRM as to Paola's as-applied challenge and REVERSE as to her facial challenges.

No. 23-50312

## I. Background

On December 28, 2021, El Paso police officers responded to a report of shots fired at Paola Connelly's home. Dispatch informed responding officers that a conflict arose between Paola's husband, John, and their neighbor. The neighbor reported that John came to his door with a machete, demanded he "apologize" for a perceived slight, then left before returning with a shotgun.

Officers heard several shots upon arriving, saw John at the neighbor's door, and arrested him after he dropped the shotgun and attempted to escape. Officers then went to the Connellys' house and spoke with Paola before conducting a sweep. Paola told officers that John and the neighbor used crack and powdered cocaine together and that she would at times smoke marijuana as a sleep aid and for anxiety. And the sweep revealed drug paraphernalia and an array of unsecured firearms and ammunition strewn about the home, including, in the bedroom, a pistol that Paola purchased.

Paola was indicted by a grand jury on two charges: (1) violating 18 U.S.C. § 922(g)(3) by possessing firearms and ammunition as an unlawful user of a controlled substance, and (2) violating 18 U.S.C. § 922(d)(3) by providing firearms and ammunition to an unlawful user of a controlled substance.[1] The indictment also contained forfeiture allegations concerning the guns and assorted ammunition found at the Connellys' house as involved in Paola's offense.

Paola moved to dismiss her indictment, arguing that *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) showed that

---

[1] The record is unclear as to what offensive conduct Paola undertook that merited her being charged under § 922(d)(3).

§§ 922(g)(3) and 922(d)(3) are unconstitutional under its historical analysis. The District Court first denied that motion. Paola filed a motion to reconsider her motion to dismiss after this Court issued *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) ("*Rahimi 2023*"), *rev'd by United States v. Rahimi*, 144 S. Ct. 1889 (2024) ("*Rahimi 2024*"). The District Court then agreed with Paola, applying *Rahimi 2023* and finding that §§ 922(g)(3) and 922(d)(3) are facial violations of the Second Amendment and that § 922(g)(3) is unconstitutional as applied to Connelly. The government timely appealed.

## II. Standard of Review

Constitutional questions receive *de novo* review. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003).

## III. Discussion

### A. Evaluating Second Amendment challenges post-*Rahimi 2024*.

The Second Amendment protects the right of individuals to "keep and bear" firearms for their self-defense. U.S. Const. amend. II. Indeed, "the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *Rahimi 2024*, 144 S. Ct. at 1897 (quoting *McDonald v. Chicago*, 561 U.S. 742, 778 (2010)); *see also id.* (quoting Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens)) ("As a leading and early proponent of emancipation observed, 'Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty.'"). "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. "'Like most rights,' though, 'the right secured by the Second Amendment is not unlimited.'" *Rahimi 2024*, 144 S. Ct. at 1897 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).

We look to our nation's "'historical tradition of firearm regulation' to help delineate the contours of the right," *id.* (quoting *Bruen*, 597 U.S. at 17), and ask "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," *id.* at 1898 (citing *Bruen*, 597 U.S. at 26–31). To do this, we must "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29) (alteration original). "Why *and* how the regulation burdens the right are central to this inquiry." *Id.* (citing *Bruen*, 597 U.S at 29) (emphasis added).

"Why" and "how" a regulation burdens the right presents two separate questions. *Rahimi 2024* gives the following guidance for determining whether a regulation presents a sufficiently historically similar "why": "if laws at the Founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category." *Id.* And it provides the below for determining whether a challenged law employs a sufficiently historically similar "how": "a law . . . may not be compatible with the right if it [is regulated] to an extent beyond what was done at the Founding[,]" "*even when [that] law regulates arms-bearing for a permissible reason.*" *Id.* (emphasis added).

The caselaw thus prescribes a two-step process for Second Amendment challenges. *First*, we ask whether the Second Amendment's plain text covers an individual's conduct. *Bruen*, 597 U.S. at 17. *Second*, we ask "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi 2024*, 144 S. Ct. at 1898 (citing *Bruen*, 597 U.S. at 26–31). It is the government's burden to demonstrate that the challenged regulation is "'relevantly similar' to laws our tradition is understood to permit." *Id.* (quoting *Bruen*, 597 U.S. at 29). It does so by

finding and explicating "historical precursors" supporting the challenged law's constitutionality. *Id.*

The challenged and historical laws are "relevantly similar" if they share a common "why" and "how": they must both (1) address a comparable problem (the "why") and (2) place a comparable burden on the right holder (the "how"). *Id.*; *Bruen*, 597 U.S. at 27–30. The government "need not [present] a 'dead ringer' or 'historical twin'" to be successful; it can also present an analogous historical regulation with a sufficiently similar "why" and "how." *Rahimi 2024*, 144 S. Ct. at 1897–98 (quoting *Bruen*, 597 U.S. at 30). Deciding whether a conceptual fit exists between the old law and the new requires the exercise of both analogical reasoning and sound judgment. *Id.* We hold the government to its heavy burden, as the Second Amendment "is *not* a second-class right." *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780) (emphasis added).

## B.     Paola is presumptively protected by the Second Amendment.

The threshold question is whether the Second Amendment applies to Paola. The right to bear arms is held by "the people." U.S. CONST. amend. II. That phrase "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Indeed, the Bill of Rights uses the phrase "the people" five times. In each place, it refers to all members of our political community, not a special group of upright citizens. *Id.* (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)); *see also Rahimi 2024*, 144 S. Ct. at 1903. Based on that consistent usage, *Heller* concluded that "the Second Amendment right is exercised individually and belongs to *all* Americans." *Heller*, 554 U.S. at 581 (emphasis added).

Marijuana user or not, Paola is a member of our political community and thus has a presumptive right to bear arms. By infringing on that right,

§ 922(g)(3) contradicts the Second Amendment's plain text. So we move to the second step: whether history and tradition support § 922(g)(3) as applied to Paola.

**C.    The government's proffered historical evidence fails to support § 922(g)(3)'s constitutionality as applied to Paola.**

The government offers three buckets of historical analogues as support for § 922(g)(3)'s constitutionality: (1) laws disarming the mentally ill, (2) laws disarming "dangerous" individuals, and (3) intoxication laws. We consider and reject each.

> *1.    History and tradition surrounding laws disarming the mentally ill do not address a problem comparable to § 922(g)(3).*

The government offers Founding-era restrictions on mentally ill persons' Second Amendment rights as being "relevantly similar" to § 922(g)(3) as applied to Paola. Obviously, mental illness and drug use are not the same thing. But at first glance one could draw an intuitive similarity: those who are "briefly mentally infirm as a result of intoxication" could be considered similar to those "permanently mentally infirm" because of illness or disability. Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 U.C.L.A. L. REV. 1443, 1535 (2009). Closer examination dispels that notion.

There are no clear sets of positive-law statutes concerning mental illness and firearms from the Founding. Indeed, "[o]ne searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership." Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and* Judicial Ipse Dixit, 60 HASTINGS L.J. 1371, 1376 (2009). In fact, the federal ban on gun possession by those adjudged mentally ill was enacted no sooner than 1968, the same year as § 922(g)(3). *See* 18 U.S.C. § 922(g)(4); *United States*

*v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010). At best, scholars suggest that the tradition was implicit at the Founding because, "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" Larson, 60 HASTINGS L.J. at 1377 (citing Henry Care, ENGLISH LIBERTIES, OR THE FREEborn SUBJECT'S INHERITANCE 329 (6th ed. 1774)). Put otherwise: if someone was so mentally ill that he presented a danger to themselves or others and could therefore be imprisoned (a greater restriction on liberty), it follows that he could also be disarmed (a lesser restriction). *See id.*

Of course, institutionalizing those so mentally ill that they present a danger to themselves or others does not give clear guidance about which lesser impairments are serious enough to warrant constitutional deprivations. We can assume that marijuana intoxication is, for our purposes, most analogous to short-term mental impairment. Dr. Benjamin Rush—who signed the Declaration of Independence—said a "temporary fit of madness" was a symptom of drunkenness.[2] Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind* 6 (8th ed., Boston, James Lording 1823). And Thomas Cooley described drunkenness as a form of "temporary insanity." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the American Union* 660 n.1 (2d ed., Boston, Little Brown & Co. 1871). So, the same could be said of intoxication via marijuana.

But laws designed to disarm the severely mentally ill do not justify depriving those of sound mind of their Second Amendment rights. The analogy stands only if someone is so intoxicated as to be in a state comparable

---

[2] We discuss why alcohol is the closest comparator and historical analogue available in the section discussing intoxication laws below. *See* III(C)(3).

to "lunacy." Just as there is no historical justification for disarming citizens of sound mind, there is no historical justification for disarming a sober citizen not presently under an impairing influence. *See infra* III(C)(3) (discussing same).

Continuing the comparison between the history and tradition of regulating access of the severely mentally ill to firearms and the regulation of intoxicated individuals' Second Amendment rights shows that the government's position is untenable.[3] The Founders purportedly institutionalized "lunatics" and stripped them of firearms yet allowed alcoholics to carry firearms while sober (and possess them generally). *See infra* III(C)(3) (discussing intoxication laws). And like historical intoxication laws (which applied restrictions only to presently intoxicated persons, *see infra* III(C)(3)), "[o]ur common law heritage has long recognized that mental illness is not a permanent condition." *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 710 (6th Cir. 2016) (Sutton, J., concurring) (evaluating relevant historical evidence under *Heller*, 554 U.S. 570) (citing William Blackstone, 1 *Commentaries* at \*304–05; A. Highmore, A Treatise on the Law of Idiocy and Lunacy 104 (1807)); *see also* Blackstone, 1 *Commentaries*, at \*304 ("For the law always imagines that these accidental misfortunes may be removed . . . ."); Highmore at 73 ("A lunatic is never to be looked upon as irrecoverable.").

Indeed, "[s]ince at least the time of Edward I (1239–1307), the English legal tradition provided that those who had recovered their sanity should

---

[3] To be clear: we express no opinion on § 922(g)(4), which concerns disarming mentally ill persons, or its constitutionality here. We examine the history and tradition behind laws disarming the mentally ill as part of our analysis of the government's attempt to analogize these laws as supporting § 922(g)(3)'s application to Paola. And, for the reasons discussed within, they do not.

have their rights restored." *Tyler*, 837 F.3d at 710 (Batchelder, J., concurring) (citing Frederick Pollock & Frederic William Maitland, 1 The History of English Law Before the Time of Edward I 507–08 (1898)). Confinement of the mentally ill was limited to as "long as such lunacy or disorder shall continue, *and no longer*." *Id*. at 706 (quoting Care, *supra*, at 329) (emphasis added). "This comports with the Founding-era conception of rights because that which a person recovered when he overcame a serious mental illness was his reason, the faculty necessary to exercise his rights." *Id*. (citations omitted). Whenever the "lunatic recover[ed] his senses," he could be reevaluated, deemed healthy, and have his legal rights restored. *See* Highmore, *supra*, at 73; *see also, e.g.,* Note, *In with the One Step, Out with the Circuit Split: Post-*Bruen *Analysis of 18 U.S.C. § 922(g)(4)*, 85 Ohio St. L. J. 113, 135–39 (collecting and analyzing relevant historical sources). So again, just as there is no historical justification for disarming citizens of sound mind (including those adjudged mentally ill but who have been reevaluated and deemed healthy, *i.e.*, no longer under an impairing influence), there is no historical justification for disarming sober citizens not *presently* under an impairing influence. *See infra* III(C)(3) (discussing same in detail).

So we must ask: why was severe mental illness a reason the Founders disarmed people, and is that "why" "relevantly similar" to § 922(g)(3)? It is not. The government highlights nothing demonstrating that laws designed to confine (and consequently, disarm) those so severely mentally ill that they presented a danger to themselves and others map onto § 922(g)(3)'s rationale. Repeat marijuana users, like repeat alcohol users, are of sound mind upon regaining sobriety, whereas those adjudged severely mentally ill often require extensive treatment and follow-up examination before they can be said to be of sound mind again. And § 922(g)(3) is not limited to those judicially determined to be severely mentally ill (or "who ha[ve] been committed to a mental institution") like those persons affected by

10

§ 922(g)(4)—not all members of the set "drug users" have been adjudicated as such (or found to require institutionalization).

So the *Bruen*-style analogical question is this: which is Paola more like: someone whose mental illness is so severe that she presents a danger to herself and others (*i.e.*, someone who would be confined and deprived of firearms under this tradition and history of Second Amendment regulation)? Or a repeat alcohol user (who would not)? Paola falls into the latter camp. While intoxicated, she *may* be comparable to a severely mentally ill person whom the Founders would disarm. But, while sober, she is like a repeat alcohol user between periods of intoxication, whom the Founders would *not* disarm.

None of the regulatory tradition vis-à-vis the mentally ill supports § 922(g)(3) as applied to Paola. Perhaps the government could succeed if it were able to demonstrate that the drugs Paola used were so powerful that they rendered her permanently impaired in a way comparable to severe mental illness. It also might succeed if it were able to demonstrate that Paola's drug use was so regular and heavy that it rendered her continually impaired. But it shows evidence of neither here.

In short, historical regulations disarming the mentally ill do not seek to address a problem comparable to § 922(g)(3), so the government fails to present a "relevantly similar" "why" to support § 922(g)(3) as applied to Paola. *Rahimi 2024*, 144 S. Ct. at 1898; *Bruen*, 597 U.S. at 27–30.

No. 23-50312

2.    *History and tradition surrounding laws disarming "dangerous" individuals also do not address a problem comparable to § 922(g)(3).*

The government also contends that persons whom Congress deems "dangerous" can have their Second Amendment rights stripped. In doing so, it posits that Paola—a non-violent marijuana user—falls into the category of "dangerous." But our history and tradition of disarming "dangerous" persons does not include non-violent marijuana users like Paola. Indeed, not one piece of historical evidence suggests that, at the time they ratified the Second Amendment, the Founders authorized Congress to disarm *anyone* it deemed dangerous. Instead, the government presents a collection of different statutes disarming discrete groups of persons throughout history, which suggest an abstract belief that one's right to bear arms could be stripped if he were legitimately dangerous to the public.

The government's examples fall into two groups. *First*, laws barring political dissidents from owning guns in periods of conflict. For example, many states barred those who refused to take an oath of allegiance during the Revolutionary War from owning guns. *See, e.g.*, 4 *Journals of the Continental Congress* 201–06 (1906) (1776 resolution); 1775–76 Mass. Acts 479; 1777 Pa. Laws 63; 1777 N.C. Sess. Laws 231; 1776–77 N.J. Laws 90. S*econd*, laws that disarmed religious minorities—especially Catholics. *See, e.g.*, 3 Jac. I, c.5, §§ 16-18 (1605–06); 1 W. & M. c.15, §§ 3-4 (1688); 7 Will. III c.5 (1695) (Ireland); Act of March 25, 1756, ch. 4, reprinted in 7 Statutes at Large; Being a Collection of All the Laws of Virginia from the First Session of the Legislature in the Year 1619, at 9, 35–36 (William Waller Hening ed., Richmond, Franklin Press 1820) (disarming "Papists" because it was "dangerous at this time to permit [them] to be armed").

Each of these categories was based in part on concerns for public safety, but each also had its own unique socio-political motivations. Laws

12

disarming dissidents were passed during wartime or periods of unprecedented societal upheaval. The Founders did not disarm English Loyalists because they were believed to lack self-control; it was because they were viewed as political threats to our nascent nation's integrity. *See* Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 60–63 (2024) (discussing, *e.g.*, laws passed proximate to a 1776 Loyalist plot to assassinate George Washington). So too with laws disarming religious minorities—the perceived threat was as political as it was religious, if not even more so. *Id.* at 36–46.

The government also offers the English Militia Act of 1662 as support, which gave officials sweeping power to designate someone as "dangerous" and so disarm him. But the Act's history shows that it merely served as cover for the widespread disarmament of Charles II's and James II's political opponents. Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 Ga. L. Rev. 1, 8 (1996) (discussing same in greater detail). And it was reined in rather quickly too.

After the Glorious Revolution, which enthroned Protestants William and Mary, the Declaration of Rights, codified as the 1689 English Bill of Rights, qualified the Militia Act by guaranteeing "[t]hat the subjects which are Protestants may have arms for their defence suitable to their Conditions and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441. "This right," which restricted the Militia Act's reach in order to prevent the kind of politically motivated disarmaments pursued by Charles II and James II, "has long been understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593. And "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*'" *Bruen*, 597 U.S. at 4 (quoting *Heller*, 554 U.S. at 599) (emphasis original). So the Militia Act, passed to disarm political dissidents

and reined in well before the Founding by the English Bill of Rights, almost certainly does not survive the Second Amendment's categorical command, at least vis-à-vis offering a "why" comparable to § 922(g)(3).

Nevertheless, an undeniable throughline runs through these sources: Founding-era governments took guns away from those perceived to be dangerous. Indeed, *Rahimi 2024* discusses this history vis-à-vis § 922(g)(8), which affirms the idea "that the government may disarm an individual temporarily after a 'judicial determinatio[n]' that he 'likely would threaten or ha[s] threatened another with a weapon.'" *See* 144 S. Ct. at 1908 (Gorsuch, J., concurring) (quoting majority op. at 1902) (alteration original). So we must ask: why were the groups disarmed at the Founding considered to be dangerous and therefore disarmed, and is that "why" "relevantly similar" to § 922(g)(3)?

It is not. The government identifies no class of persons at the Founding who were "dangerous" for reasons comparable to marijuana users. Marijuana users are not a class of political traitors, as English Loyalists were perceived to be. Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists.

And § 922(g)(3) is not limited to those judicially determined to have had a history of violent behavior (or a propensity to engage in same) like those persons discussed in *Rahimi 2024*—not all members of the set "drug users" are violent. As applied, the government has not shown how Paola's marijuana use predisposes her to armed conflict or that she has a history of drug-related violence.

Even as the Founders disarmed Catholics and politically disaffected citizens, they left ordinary drunkards unregulated. *See* III(C)(3) (discussing same). The government provides no meaningful response to the fact that neither Congress nor the states disarmed alcoholics, the group most closely

14

analogous to marijuana users in the 18th and 19th centuries. As with the analogy to mental illness, we must ask: Which are marijuana users more like: British Loyalists during the Revolution? Or repeat alcohol users? The answer is clearly the latter, so the government's attempt to analogize non-violent marijuana users to "dangerous" persons fails to present a "relevantly similar" "why." *Rahimi 2024*, 144 S. Ct. at 1898; *Bruen*, 597 U.S. at 27–30.

> 3.    *History and tradition surrounding intoxication laws* may *address a problem comparable to § 922(g)(3), but do not impose a comparable burden in doing so.*

There was very little regulation of drugs (related to firearm possession or otherwise) until the late 19th century, so intoxication via alcohol is the next-closest "historical analogue" that we can look to. *See, e.g.*, David F. Musto, *The American Experience with Stimulants and Opiates*, 2 PERSPS. ON CRIME & JUST. 51, 51 (1998) ("[M]ost [non-alcoholic] drugs were not familiar products early in the 19th century . . . ."); Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 VA. L. REV. 971, 985–87, 1010–11 (1970) (describing how American society gradually realized the social effects of narcotics in the late 1800s and began regulating them at the turn of the century); *id.* at 1011 ("[From 1914–31], we can find no evidence of public concern for, or understanding of, marijuana, even in those states that banned it. . . . Observers in the middle and late 1930's agreed that marijuana was . . . a very new phenomenon on the national scene."). And early Americans, including the Founders, consumed copious amounts of alcohol.[4]

---

[4] For example, Thomas Jefferson, an avid wine connoisseur, once wrote that the "light and high flavored wines" were a "necessary of life" for him. Letter from Thomas Jefferson to Thomas Appleton (Jan. 14, 1816), Nat'l Archives, https://founders.archives.gov/documents/Jefferson/03-09-02-0222) (last visited August

The Founders were well familiar with the commonsense notion that those presently impaired by alcohol lack the restraint needed to handle firearms safely. *See* Rush, *supra*, at 6. It is unsurprising that historical laws dealing with firearms and alcohol exist, and these rules are relevant to our history and tradition of gun regulation. But as discussed below, the government can identify *no* laws at the Founding that approximate § 922(g)(3). The closest it gets is pointing us to laws passed by a few states after the Civil War barring carrying weapons while under the influence. These non-Founding era historical laws are of, at best, limited utility. *See Bruen*, 597 U.S. at 4. But more than that, while this may show that some laws banned *carrying* weapons while under the influence, none barred gun *possession* by regular drinkers.

    i.      <u>Founding-era laws.</u>

Founding-era laws concerning guns and alcohol were few, and primarily concerned with (1) misuse of weapons while intoxicated and (2)

---

8, 2024). And only a few days before the Constitution's signing, a volunteer cavalry corps that crossed the Delaware River with George Washington during the Revolutionary War held a farewell party for him at The City Tavern in Philadelphia. According to the evening's bar tab, the 55 attendees ordered "54 bottles of Madeira, 60 bottles of Claret, 8 bottles of whiskey, 8 bottles of cider, 12 bottles of beer and 7 large bowls of punch." Bill for an Evening of Entertainment for George Washington - 14 September 1787, Quill Project, https://www.quillproject.net/resources/resource_item/38/3109 (last visited August 8, 2024). After retiring to Mount Vernon, Washington operated one of the largest and most profitable distilleries in the nation, which once produced 11,000 gallons of whiskey in a single year. *Ten Facts About the Distillery, Monticello*, https://www.mountvernon.org/the-estate-gardens/distillery/ten-facts-about-the-distillery/ (last visited August 8, 2024) ("In 1799, Washington's Distillery produced almost 11,000 gallons of whiskey, valued at $7,500 (approximately $120,000 today.)"). *See also, e.g.,* Letter from John Adams to William Willis (Feb. 21, 1819), in 10 The Works of John Adams, Second President of the United States 365, 365 (Charles Francis Adams ed., Boston, Little, Brown & Co. 1856) (claiming that Americans "exceed all other and millions of people in the world in this degrading, beastly vice of intemperance."); Musto, *supra*, at 52 (finding that "[i]n the early Republic," there was "an extremely high level of alcohol consumption (chiefly, distilled spirits)").

disciplining state militias. For example, a 1655 Virginian law banned "shoot[ing] and gunns at drinkeing." Acts of Mar. 10, 1655–56, Act 12, *reprinted in* 1 The Statutes At Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619, at 401, 401–02 (William Waller Hening ed., New York, R. & W. & G. Bartow 1823). But this statute is not like § 922(g)(3). Virginia passed this statute explicitly as a gunpowder preservation measure (which was at a premium), and because ill-timed gunshots could be mistaken as a signal that Natives were attacking.[5] But not only was this statute enacted for a different purpose than was § 922 (g)(3), it did not ban gun carry or even possession—it only prevented colonists from misusing the guns they did have *while they were drinking.*

The government also offers a 1771 law from New York, which banned citizens from firing guns during New Year's celebrations. Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 The Colonial Laws of New York from the Year 1664 to the Revolution 244, 244–245 (Albany, James B. Lyon 1894). But while this law was passed for a similar purpose as § 922 (g)(3)—preventing the "great Damages" done by those "intoxicated with Liquor"—it was very narrow. *Id.* It applied only three days out of the year, only prevented firing guns (not possessing or carrying them), and applied only to those under the influence, not habitual drinkers. *Id.*

---

[5] According to the statute, the misuse of weapons while intoxicated furthered "that beastly vice[:] spending much powder in vaine" instead of "reserve[ing] [it] against the comon enemie," "the Indians." Acts of Mar. 10, 1655–56, Act 12, *reprinted in* 1 The Statutes at Large 401. Plus, "[t]he only means for the discovery of [Indian] plotts is by allarms, of which no certainty can be had in respect of the frequent shooting of gunns in drinking." *Id.* at 401. The 1656 law was a descendant of a 1632 law, which prevented "spend[ing] powder unnecessaril[y] . . . in dringinge or enterteynments." Acts of Feb. 24, 1631–32, Act 50, *reprinted in* 1 The Statutes at Large 155, 173.

Beyond these generally inapposite colonial statutes—separated by over a century—the government offers no Founding-era law or practice of disarming ordinary citizens for drunkenness, even if their intoxication was routine. Instead, it offers laws regulating militia service.

For example, soldiers in New Jersey could be "disarm[ed]" if they appeared for militia service "disguised in Liquor." Act of May 8, 1746, ch. 200, § 3, *reprinted in* Acts of the General Assembly of the Province of New-Jersey 140, 140–41 (Samuel Allison ed., Burlington, Isaac Collins 1776). Pennsylvania passed a similar act. *See* Act of Mar. 20, 1780, ch. 902, § 45, *reprinted in* 2 Military Obligation: The American Tradition, pt. 11, at 75, 97 (Arthur Vollmer ed., 1947) ("[I]f any non-commissioned officer or private shall . . . be found drunk . . . he shall be disarmed . . . until the company is dismissed . . . .").

Again, this comparison misses the mark. The purpose behind these militia laws concerns military service—intoxicated servicemembers cannot perform their duties while impaired. More than that, these laws applied only to militia members; none of them spoke to a militia member's ability to carry outside of military service. Then, as today, restrictions on the liberties of service members tell us little about the limits acceptable for citizens at large.

Considering the "extremely high level of alcohol consumption" "[i]n the early Republic," this handful of generally inapposite laws does little to help the government's position. Musto, *supra*, at 52. The government fails to identify any relevant Founding-era tradition or regulation disarming ordinary citizens who consumed alcohol.

ii.    <u>Post-Reconstruction laws.</u>

Again, "when it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Bruen*, 597 U.S. at 4

(quoting *Heller*, 554 U.S. at 599) (emphasis original). And "because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 36 (quoting *Heller*, 544 U.S. at 614). So, "we must . . . guard against giving postenactment [sic] history more weight than it can rightly bear." *Id.* at 35.

With that in mind, the government's proffered Reconstruction-era evidence does little to validate § 922(g)(3) as applied to Paola: three states, between 1868 and 1883, barred citizens from carrying guns *while drunk*: Kansas, Missouri, and Wisconsin. *See* 1867 Kan. Sess. Laws 25; Mo. Rev. Stat. § 1274 (1879); 1883 Wis. Sess. Laws 290. It also offers a similar Idahoan law from even later in time. 1909 Idaho Sess. Laws 6. These laws come closer to supporting § 922(g)(3), but there are notably few.

That's a problem for the government. *Bruen* doubted that three *colonial-era laws* could suffice to show a tradition. 597 U.S. at 46 ("For starters, we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation.") (emphasis original). Offering three laws passed scores of years post-Ratification (and a fourth passed nearly half a century beyond that) misses the mark by a wide margin. *See id.* at 35–36.

\* \* \*

Boiled down, § 922(g)(3) is much broader than historical intoxication laws. These laws may address a comparable problem—preventing intoxicated individuals from carrying weapons—but they do not impose a comparable burden on the right holder. In other words, they pass the "why" but not the "how" test. *See Rahimi 2024*, 144 S. Ct. at 1898; *Bruen*, 597 U.S. at 27–30. Taken together, the statues provide support for banning the *carry* of firearms *while actively intoxicated*. Section 922(g)(3) goes much further: it

No. 23-50312

bans *all* possession, and it does so for an undefined set of "user[s]," even while they are not intoxicated.

As applied to Paola, § 922(g)(3) restricts her rights more than would any of the historical and traditional laws highlighted by the government. While older laws' bans on "carry" may be analogous to § 922(g)(3)'s ban on "possess[ion]," there is a substantial difference between an actively intoxicated person and an "unlawful user" under § 922(g)(3). The statutory term "unlawful user" captures regular marijuana users, but the temporal nexus is most generously described as vague—it does not specify how recently an individual must "use" drugs to qualify for the prohibition. *See* 27 C.F.R. § 478.11 (defining terms in § 922(g)(3)) ("A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person . . . possesses a firearm."). Stunningly, an inference of "current use" can be drawn even from "a conviction for use or possession of a controlled substance *within the past year*." *Id.* (emphasis added).

Paola stated that she would at times partake as a sleep aid or to help with anxiety, but we do not know how much she used at those times or when she last used, and there is no evidence that she was intoxicated at the time she was arrested. Indeed, under the government's reasoning, Congress could (if it wanted to) ban gun possession by anyone who has multiple alcoholic drinks a week from possessing guns based on the intoxicated carry laws.

The analogical reasoning *Bruen* and *Rahimi 2024* prescribed cannot stretch that far. The history and tradition before us support, at most, a ban on carrying firearms while an individual is *presently* under the influence. By regulating Paola based on habitual or occasional drug use, § 922(g)(3) imposes a far greater burden on her Second Amendment rights than our

20

history and tradition of firearms regulation can support. We AFFIRM the judgment of dismissal as to Paola's as-applied challenge.

## D.  § 922(g)(3) is facially constitutional.

Paola also levied a facial challenge at § 922(g)(3). A facial constitutional challenge is the "'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that *no* set of circumstances exists under which the Act would be valid.'" *Rahimi 2024*, 144 S. Ct. at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (emphasis added). Facial challenges should "consider the circumstances in which [the challenged act i]s most likely to be constitutional" because "when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not to manufacture conflict." *Id.* at 1903 (cleaned up). "That means that to prevail, the Government need only demonstrate that Section 922(g)([3]) is constitutional in some of its applications." *Id.*

The government made such a demonstration. As discussed above, our history and tradition of firearms regulation show that there are indeed some sets of circumstances where § 922(g)(3) would be valid, such as banning presently intoxicated persons from carrying weapons. *See supra* III(C)(3) (discussing intoxication laws). Because there are at least some circumstances where § 922(g)(3) is constitutional, Paola's facial challenge fails and we REVERSE.

## E.  § 922(d)(3) is facially constitutional.

Paola also levied a facial challenge at § 922(d)(3), but that fails because § 922(d)(3) is a straightforward extension of § 922(g)(3) in at least one respect. The latter prohibits the *possession* of firearms by someone unlawfully using controlled substances while the former prohibits the *transfer* of firearms to someone unlawfully using controlled substances. Put otherwise, if one can be indicted for being presently intoxicated when arrested with a firearm

without violating the Second Amendment, *see* III(D), it follows that one could be similarly indicted for providing a presently intoxicated individual with a firearm. For this reason, the historical evidence that supports § 922(g)(3)'s facial constitutionality supports § 922(d)(3)'s too. *See Rahimi 2024*, 144 S. Ct. at 1897–98 (holding that the government "need not [present] a 'dead ringer' or 'historical twin'" to be successful but can also present an analogous historical regulation with a sufficiently similar "why" and "how."). Because there are at least some instances where § 922(d)(3) may be constitutionally applied, Paola's facial challenge fails and we REVERSE. *See id*. at 1903.

## IV.   Conclusion

Paola's § 922(g)(3) charge is inconsistent with our history and tradition of firearms regulations for the reasons discussed above, so we AFFIRM the judgment of dismissal as to her as-applied challenge. But that holding is narrow. There undoubtedly exist circumstances where § 922(g)(3) may apply constitutionally, such as when it bans a presently intoxicated person from carrying firearms, so we REVERSE as to Paola's facial challenge. Finally, we REVERSE as to Paola's facial challenge to § 922(d)(3).